THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| AMANDA G. LYNCH, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | Case No. 08-6115-CV-SJ-ODS |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) | |
| Defendant. | ) | |

ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Plaintiff appeals the Commissioner's final decision denying her application for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in June 1971, graduated from high school, and has a cosmetology license. She has prior work experience as a cosmetologist, an assistant manager at a gas station, and a manger at a deli. She amended her disability onset date to July 11, 2004.

Plaintiff married in July 2004, and her husband (who was employed) had custody of his twin eleven year old children. Plaintiff quit working after getting married, but denies the marriage or the need to care for the children motivated this decision. At various times, Plaintiff has indicated she is unable to work due to depression, migraine headaches, or back and shoulder pain.

A.  Mental History

Plaintiff first sought treatment in November 2004, at Pathways Community Behavioral Healthcare ("Pathways").  She reported diminished self-esteem, hopelessness, fatigue, and a feeling of wanting "to cry all the time," R. at 501 – but attributed her inability to work to "5 bulging discs."  R. at 504.  Her GAF score was 55, and Plaintiff agreed to participate in outpatient treatment.  R. at 506-07.  Ms. Rivers served as Plaintiff's therapist, and Plaintiff saw her on a fairly regular basis until May 2006.  Plaintiff also received medication from a physician at Pathways, Dr. Robin Reed.  During this time Plaintiff was prescribed Effexor (an antidepressant), Klonopin (to treat anxiety) and Ambien (a sleep aid).  There is no need to detail each of Plaintiff's visits, although some clear impressions can be drawn.  Plaintiff experienced a great deal of stress due to events in her life, starting first with difficulty dealing with her new family and her husband's ex-wife.  R. at 485.  In June 2005 Plaintiff moved out of the house and her husband obtained an order of protection against her.  R. at 476, 479.  At around this time period Plaintiff's GAF was re-evaluated and determined to be 45; while it continued to be reported as a 45 thereafter, the records demonstrate this was based on the mid-2005 evaluation.  Plaintiff lived in a women's shelter from approximately July to August.  R. at 454, 468.  In August 2005 her husband filed for divorce.  R. at 452.  In December, Plaintiff's divorce was finalized and her claim for social security benefits was denied.  R. at 426.  In March or April of 2006, Plaintiff's mother passed away.  The records demonstrate Plaintiff felt depressed during many of these stressful time periods, and began experiencing stress-induced migraines during the last part of 2005.  At various times her medication was increased, and she generally reported positive results from medication.  E.g., 416-17.  The last records from Pathways are dated May 15, 2006; on that date, Plaintiff's Effexor, Klonopin and Ambien were continued and she was started on Topamax (a treatment for migraines).

In August 2006, Plaintiff went to the North Central Missouri Mental Health Center ("North Central") complaining of depression.  "She was assigned [a] doctor, case worker and counselor."  R. at 786.  On September 8, Plaintiff saw her counselor (Gordon

2

Leach) and reported "struggling very hard due to what she considers unfair treatment at the hands of her landlord." R. at 784. Less than a week later, she was "in a very upbeat mood," R. at 783, and one week later was "confused" as she was attempting to evaluate her relationship with her new boyfriend. R. at 782. September and October were marked by continuing difficulties coping with problems with her boyfriend and conflict with her grandmother over the administration of her mother's estate and execution of her mother's will. R. at 761-62, 772-78.

In October, a psychiatrist (Henry Wisdom) and a qualified mental health professional (LaRee Harvey) at North Central jointly prepared a Psychosocial/Clinical Assessment. Plaintiff's medications consisted of Topamax, Vicodin, Axert, Metformin, Ibuprofen, Tizanidine, Effexor, Clonazepam and Lipitor. She reported crying on a daily basis, migraines, depression, irritability and stress. She described her daily activities as including cooking and gardening, but declared herself unable to work because she cannot lift things or sit or stand for very long. She expressed no interest in working, but was interested in returning to school "to become a counselor." R. at 763-71. Less than a week later, Dr. James Fleming (a psychiatrist) evaluated Plaintiff and diagnosed her as suffering from major depression. He assessed her GAF score in the 60 to 65 range, continued her prescription for Effexor and decreased her dosage of Clonazepam. R. at 758-59.

In November Plaintiff continued to be depressed over difficulties with her family and her landlord. R. at 750-57. In January 2007, Plaintiff moved in with her grandmother and "had improved their relationship." R. at 744. This harmony was short-lived; augmenting this source of stress was her boyfriend's impending surgery. R. at 740-43. She moved into an apartment in February, but almost immediately developed an "ongoing feud" with her landlord. R. at 735-36. She also continued to deal with the legal battle with her grandmother over her mother's estate.

On March 28, 2007, Dr. Wisdom noted Plaintiff had "done very well" on the medications prescribed and opined that "with the continued use of this combination she will do very well." Her medication was not changed. R. at 726.

3

The last record from North Central is dated July 11, 2007. Between March and July, Plaintiff continued expressing depression over her relationships with her grandmother and son.

On April 28, 2007, Dr. Reed wrote a letter confirming she "stopped seeing" Plaintiff in her office one year prior, but represented she had "maintained contact" since then. There are no records of this contact. Regardless, Dr. Reed described Plaintiff as exhibiting symptoms not documented by Plaintiff's then-treating physicians, or even by Dr. Reed when she was Plaintiff's doctor. R. at 626-27.

Sandwiched around this history are two separate consulting evaluations conducted by psychologist John Keough. In December 2004, Plaintiff told Mr. Keough she was disabled "because she has severe depression, 5 bulging discs in her back that [a]ffect her arms and neck, and she is in pain all the time." R. at 284. Plaintiff reported rather normal daily activities, and Mr. Keough concluded Plaintiff's "ability to understand and remember instructions is unimpaired with regard to psychological issues. [She] appears to be experiencing a mild level of impairment with regard to her ability in sustaining concentration, being persistent in tasks, and maintaining an adequate pace in productive activity necessary to be gainfully employed working a 40-hour week for a duration of at least 12 months." He also indicated Plaintiff's adaptability was "mildly limited by a mood disorder." R. at 286. Mr. Keough second evaluation was performed in December 2007. This time he administered various tests, but determined the results were invalid because Plaintiff was faking poor responses. His conclusions were largely identical to those he expressed in December 2004. R. at 787-89.

Dr. Stanley Golon testified at the administrative hearing as a medical expert. He indicated a general mistrust of the standardized testing used to determine the reliability of psychological testing, and therefore chose to accept the results of Mr. Keough's tests. R. at 34-35.

4

B. Physical History

On May 18, 2004, Plaintiff saw her primary doctor (Dr. Christine Moore) complaining of pain in her right shoulder. R. at 337. An MRI on June 14, 2004, revealed mild teninosis, but no muscular or rotator cuff tear. R. at 265. On July 1, Dr. Moore instructed Plaintiff to use hot compresses and stretching exercises and provided her with a work excuse until July 5. R. at 334. The remainder of Dr. Moore's records relate to ordinary matters and treatment of Plaintiff's diabetes. Nonetheless, on August 16, 2005, she wrote a letter indicating Plaintiff suffers from cervical disease and opining Plaintiff could not work due to the combination of mental and physical ailments. R. at 309-13. Testing performed subsequent to this letter revealed no major problems with Plaintiff's back. R. at 541, 594-96.

The Record also reflects (and the ALJ found) Plaintiff engaged in "drug seeking behavior." Plaintiff went to emergency rooms and doctors complaining of pain (typically headaches) to obtain Vicodin or other narcotic pain medication without reporting the treatment or drugs she was receiving from others. R. at 19-20.

C. The ALJ's Decision

The ALJ declined to rely on Dr. Reed's April 2007 letter because it was inconsistent with Dr. Reed's treatment prior notes and the notes of those who were treating Plaintiff in 2007. She declined to rely on the medical expert's assessment because it relied on test results that the person administering the tests found to be unreliable. The ALJ also found Dr. Moore's assessment to be unreliable because it was not supported – indeed, it was contradicted – by objective medical evidence. The ALJ also found Plaintiff's credibility wanting in several respects, including (1) Plaintiff's behavior suggested a desire for medication unconnected to treatment, suggesting an exaggeration of her ailments and (2) her varying explanations for her inability to work. Ultimately, the ALJ found Plaintiff could perform light work with certain restrictions but

5

could not return to her past work. Based on testimony from vocational experts, the ALJ determined Plaintiff could work as a housekeeper, cashier or intra-office messenger.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A. Opinions of Treating Professionals

Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Here, the ALJ's decisions were justified. Dr. Reed had not seen Plaintiff professionally for over a year and described extreme behavior that was not documented by those treating Plaintiff at that time. Dr. Moore's description of Plaintiff's back condition was refuted by objective medical testing.

6

Plaintiff also suggests that if the ALJ had doubts or concerns about the physicians' opinions, she was obligated to contact them to further develop the record. The Court disagrees. The ALJ is obliged to fairly develop the record, and in this case the doctors' records were solicited, submitted, reviewed and considered. The presence of inconsistencies does not require continued and potentially never-ending dialogues with medical practitioners; if it did, cases such as Haggard and Pena could not exist. The ALJ is obligated to take steps necessary to make sure the record is complete, and to resolve conflicts that may appear; the ALJ is not obligated to solicit opinions and explanations from Plaintiff's doctors to resolve those conflicts.

B.  Sufficiency of the Evidence

Plaintiff criticizes aspects of the ALJ's decision, but the governing standard of review does not allow the Court to reweigh the evidence. As is often the case, the evidence can be construed in a manner that supports Plaintiff's claim – but the fact this can be done does not mean an error occurred. Here, Plaintiff's mental/psychological problems stem from stressors in her life and not from a persistent medical condition. Moreover, the record suggests Plaintiff's medication successfully addresses her problems, and that she is not as debilitated as she avers.

The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just

> one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

The Court accepts Plaintiff's argument that her subjective complaints of pain cannot be discounted or ignored simply because they are not fully corroborated by objective medical evidence – but the absence of such evidence is still a factor that may be considered. Plaintiff's efforts to obtain narcotic medication suggest a desire apart from a legitimate medical condition, which undercuts her claims of debilitating pain.

Ultimately, the question is not whether the Court believes Plaintiff is disabled, but whether the ALJ's decision is supported. Substantial evidence supports the ALJ's decision, and this is all the law requires.

### III. CONCLUSION

The Commissioner's final decision denying benefits is affirmed.
IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: July 14, 2009    UNITED STATES DISTRICT COURT

8